PRESENT: All the Justices

JULIA FRIDAY-SPIVEY

OPINION BY
v.  Record No. 032315        JUSTICE G. STEVEN AGEE
September 17, 2004

CHARLES LEE COLLIER

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Kathleen H. MacKay, Judge

Julia Friday-Spivey, the plaintiff in a personal injury
action arising from a collision between her vehicle and a fire
truck, appeals from the judgment of the trial court holding that
the defendant, Charles Lee Collier, was protected by the
doctrine of sovereign immunity with regard to his alleged
negligence while operating the fire truck.  The issue before us
is whether Collier's driving of the fire truck, under the facts
of this case, required the exercise of judgment and discretion
sufficient to invoke the protection of sovereign immunity.  We
conclude that it did not and therefore will reverse the judgment
of the trial court.

I.  BACKGROUND AND PROCEEDINGS BELOW

At the time of the accident at issue, Friday-Spivey was
operating a vehicle westbound on Spring Mall Road in Fairfax
County.  Collier, a fire technician employed by the Fairfax
County Fire and Rescue Department,[1] was driving a fire truck

---

[1] Although Friday-Spivey originally alleged that Collier was
employed by the Fire Department, the parties did not dispute
that he was in fact an employee of Fairfax County.

owned by the Greater Springfield Volunteer Fire Department (the "Fire Department") eastbound on Spring Mall Road. As Collier attempted to turn left into a shopping mall parking lot, he allegedly failed to yield the right of way to Friday-Spivey, thereby colliding with her vehicle. As a result of the impact, Friday-Spivey sustained personal injuries.

Friday-Spivey filed an action against Collier and the Fire Department to recover damages for the injuries she sustained in the accident. Both defendants filed pleas in bar. The trial court sustained the Fire Department's plea in bar and dismissed it from the case with prejudice pursuant to the provisions of Code § 27-23.6(B) in effect at that time.[2]

Testimony at the ore tenus hearing on Collier's plea in bar established that at the time of the accident, Collier was en route to the shopping mall in response to a "Priority 2" dispatch regarding an infant locked in a vehicle at that

---

[2] In pertinent part, the prior version of that statute authorized a county to "provide fire-fighting and rescue services to its citizens by using both government-employed and volunteer company or association firefighters and rescuers." If a county utilized such a system, the volunteer companies and associations were "deemed an instrumentality of the county . . . and as such exempt from suit for damages done incident to providing fire-fighting and rescue services to the county . . . ." Code § 27-23.6(B)(2000). Subsequent amendments have not materially altered these provisions.

location.  Collier knew nothing about the infant's condition at that time.

In responding to a Priority 2 call, Collier acknowledged that according to Fairfax County Fire and Rescue Department Standard Operating Procedures, he was required to proceed without activating warning devices, i.e., "no lights and no sirens," and to obey all statutes governing the operation of motor vehicles.[3]  Nonetheless, he had to "drop everything and proceed to the call."  Collier's duty, as a fire technician, was to deliver the manpower and equipment needed to assist the infant.

At the time of the accident, Collier was driving a pumper truck with a crew of four: his captain, a paramedic, a fire fighter, and himself as the driver.  While on duty, this crew was required to stay together at all times in case they had to respond to a dispatch.  According to Collier, a pumper truck weighs 40,000 pounds.  He received specific training to drive that vehicle, including both written and "over the road" examinations.  When asked about the decisions he was required to make in responding to the Priority 2 dispatch on the day of the accident, Collier stated, "Well, the route of travel, the

_____

[3] In contrast, a "Priority 1" call means that there is a "[g]reat potential for loss of life or serious injury." Response to a Priority 1 call requires the use of warning equipment.

address, I am driving a large piece of equipment, it's pretty heavy, so I have to be extra careful when I'm driving the fire truck, it's not like driving my personal car on the road. Stopping distances, and so forth." He also testified that he "decided to take the quickest route possible" because an infant was locked in a vehicle and "we just [did not] know what to expect when we [got] there."

After the hearing on Collier's plea in bar, the trial court sustained that plea, finding that Collier was entitled to sovereign immunity. The court subsequently entered an order dismissing Collier from the action with prejudice. We awarded Friday-Spivey this appeal.

## II.  ANALYSIS

This Court has outlined a four-factor test for determining whether an individual working for an immune governmental entity, such as a county employee like Collier, is entitled to the protection of sovereign immunity. James v. Jane, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980); Messina v. Burden, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984). The parties agree Collier meets three of the four factors and the sole issue is the fourth factor: "whether the act in question involved the exercise of

4

discretion and judgment."[4] Colby v. Boyden, 241 Va. 125, 129, 400 S.E.2d 184, 187 (1991).

Friday-Spivey argues that the facts of this case are governed by this Court's holding in Heider v. Clemons, 241 Va. 143, 400 S.E.2d 190 (1991). In Heider, a deputy sheriff collided with a motorcycle as he was leaving a residence where he had just served judicial process. 241 Va. at 144, 400 S.E.2d at 190. Heider argued "that, as a deputy sheriff who regularly and necessarily operated an automobile to perform his legal duty of serving judicial process, he was entitled to the sovereign immunity defense with respect to the operation of the automobile." Id., 400 S.E.2d at 190-91. We disagreed, holding that Heider was not entitled to sovereign immunity under the circumstances of the case because "the simple operation of an automobile did not involve special risks arising from the governmental activity, or the exercise of judgment or discretion about the proper means of effectuating the governmental purpose of the driver's employer." Id., 400 S.E.2d at 191. In that case, the deputy sheriff was like any other person driving a car

---

[4] The four factors are: (1) the function performed by the employee, (2) the extent of the state's interest and involvement in that function, (3) the degree of control and direction the state exercises over the employee, and (4) whether the act performed involves the use of judgment and discretion. James v. Jane, 221 Va. at 53, 282 S.E.2d at 869 (1980).

who "must make myriad decisions." Id. The duty of care in ordinary driving situations "is a ministerial obligation." Id.

Collier distinguishes Heider in several respects. The deputy sheriff in that case had completed his governmental purpose and was leaving the scene without any urgency. In contrast, Collier was on his way to accomplish the governmental purpose of delivering the manpower and equipment necessary to rescue an infant locked in a car. Collier cites as examples of discretion and judgment his determination of the route to be taken and the maneuvering of the 40,000-pound pumper truck through traffic. Collier also notes that, unlike the police car in Heider, a 40,000-pound pumper truck requires specialized training to operate. Collier essentially argues that he is entitled to sovereign immunity because the inherent difficulty and special skills required in operating a specialized piece of equipment (the pumper truck) means he "is not like any other driver in routine traffic." Under the facts of this case, we disagree.

In Stanfield v. Peregoy, 245 Va. 339, 429 S.E.2d 11 (1993), we considered whether a city employee driving "a combination snow plow/salt truck," was entitled to sovereign immunity in an action for negligence occurring while plowing and salting city streets during a snowstorm. Id. at 341, 429 S.E.2d at 12. While it is true that in affirming the trial court's grant of

6

sovereign immunity we commented that "the defendant had completed a special course of instruction given to the employees selected to operate the equipment," id. at 342, 429 S.E.2d at 12, we implicitly rejected a rationale based on the use of special equipment or specialized training by a government employee as a basis for decision:

> Perhaps if this accident had happened as defendant was driving his truck en route to the area he was assigned to plow and salt, or if it occurred when he was returning to his Department's headquarters after completing his function of plowing and salting, he would have been engaged in 'the simple operation' of the truck 'in routine traffic,' a ministerial act.

Id. at 344, 429 S.E.2d at 13.

Likewise, in Wynn v. Gandy, 170 Va. 590, 197 S.E. 527 (1938),

> the driver of a school bus asserted the defense of sovereign immunity on the basis that operation of the bus was an act undertaken on behalf of the government. We held that sovereign immunity was not available to the bus driver, stating that the defense does not apply to 'the performance of duties which do not involve judgment or discretion in their performance but which are purely ministerial.'

Heider, 241 Va. at 145, 400 S.E.2d at 191. In Wynn we were not concerned with whether driving a school bus "sufficiently large to accommodate . . . from ninety to 112 children," required any special training, despite the fact that "the bodies of large buses of this type are extended on both sides" such that the

7

driver "could not see persons at either side [of the bus] after the front of the bus had passed" and the street was filled with "rollicking and excited children." Wynn, 170 Va. at 593-94, 197 S.E. at 528.

Despite a natural inclination to classify the report of a child in a locked car as an "emergency," the facts of this case do not support the conclusion that Collier's driving involved the exercise of judgment and discretion beyond that required for ordinary driving in routine traffic situations. Collier testified that "Priority 2 calls are considered public service calls" involving "[a]nything from a cat in a tree to a leaky water pipe." Specifically, Collier confirmed that "when [he] got this Priority 2 call, this was a public service call."[5]

During his deposition Collier also admitted that, based on what he knew at the time, "there was no danger" involved in the call to which they were responding and he understood that "when [he] got a [Priority 2] call, [he was] to respond in a nonemergency manner and conform to all the traffic regulations." When asked on direct examination whether "there [was] any difference in the way you respond to a call for a cat in a tree versus an infant locked in a car, according to your regulations," Collier responded: "My regulations, no." And

---

[5] The Fairfax County fire department receives between 4,500 and 5,000 public service calls a year.

although Collier had to "drop everything and proceed to the call," he specifically testified that was true for all calls "whether you get either a priority one or a priority two call."

As established by his own testimony, Collier was driving in a nonemergency manner without lights and sirens, to a "public service call" during which he was required to obey all traffic regulations. The special skill and training required to operate a fire truck under these circumstances is not the exercise per se of judgment and discretion for purposes of sovereign immunity. To find otherwise would not comport with our prior decisions, which have held that sovereign immunity does not extend to "ordinary driving situations," Heider, 241 Va. at 145, 400 S.E.2d at 191, in "routine traffic." Colby, 241 Va. at 129, 400 S.E.2d at 187. Thus, there were no "special risks" inherent in Collier's task as existed in cases such as Colby (police officer in hot pursuit in a high speed chase with emergency lights and siren activated), or National R.R. Passenger Corp. v. Catlett Volunteer Fire Co., 241 Va. 402, 404 S.E.2d 216 (1991) (fire truck en route to a burning vehicle with emergency lights and siren activated).

Collier's suggestion that a controlling factor is whether a government employee received specialized training in the operation of a special or heavy duty vehicle (e.g., tractor-trailer, fire truck, school bus, dump truck, snow plow, etc.)

9

has been effectively rejected in prior decisions.  Such a rule would create a blanket immunity as a matter of law whenever that vehicle was used to perform a governmental function.  The analysis by this Court in prior decisions demonstrates that this suggested approach has been rejected.  Immunity was rejected in Wynn even though the vehicle was oversized and specialized, a result noted with approval more recently in Heider.  The comments by this court in Stanfield quoted above also make it clear that not all driving of a specialized vehicle will be immune.

Obviously, there are situations where responding to a child locked in a car is under such exigent circumstances that the government employee responding must use a degree of judgment and discretion beyond ordinary driving situations in routine traffic to accomplish that governmental mission.  On this record, however, that is not this case.  Collier was in routine traffic under a mandate "to respond in a nonemergency manner and conform to all the traffic regulations."  Nothing in this record reflects that any special characteristic of the fire truck had any nexus whatsoever to the accident.  Collier's driving was a ministerial act requiring no significant judgment and discretion beyond that of ordinary driving in routine traffic.

III.  CONCLUSION

10

For the reasons previously stated, we conclude that Collier did not exercise judgment and discretion beyond that necessary in an ordinary driving situation – a ministerial act.  As such, he is not entitled to sovereign immunity for his alleged negligence.  Accordingly, the judgment of the trial court will be reversed and the case remanded to the trial court for further proceedings not inconsistent with this opinion.

<u>Reversed and remanded.</u>

JUSTICE KINSER, with whom JUSTICE KOONTZ joins, dissenting.

Because I conclude that driving a 40,000-pound fire truck to a shopping mall in response to a dispatch involving an infant locked in a vehicle required the exercise of judgment and discretion in order to effectuate the governmental purpose of providing rescue services, I respectfully dissent.

In Virginia, the question whether an individual working for an immune governmental entity, such as a county employee like Charles Lee Collier, is entitled to the protection of sovereign immunity is answered by applying a four-part test first enunciated in <u>James v. Jane</u>, 221 Va. 43, 53, 282 S.E.2d 864, 869 (1980) and reiterated in subsequent cases.  <u>Messina v. Burden</u>, 228 Va. 301, 313, 321 S.E.2d 657, 663 (1984).  The four factors are: "(1) the nature of the function the employee performs; (2) the extent of the government's interest and involvement in the function; (3) the degree of control and direction exercised over

11

the employee by the government; and (4) whether the act in question involved the exercise of discretion and judgment." Colby v. Boyden, 241 Va. 125, 129, 400 S.E.2d 184, 186-87 (1991); accord Nationwide Mut. Ins. Co. v. Hylton, 260 Va. 56, 63, 530 S.E.2d 421, 424 (2000); Stanfield v. Peregoy, 245 Va. 339, 342, 429 S.E.2d 11, 12 (1993).

In the present case, the plaintiff, Julia Friday-Spivey contends, and the majority agrees, that the fourth prong of the test was not satisfied. The majority concludes that Collier "did not exercise judgment and discretion beyond that necessary in an ordinary driving situation – a ministerial act." In reaching that conclusion, the majority relies primarily on the fact that the dispatch to rescue an infant locked in a vehicle was categorized as "Priority 2," as would be a dispatch concerning a cat in a tree, and that the situation was not an actual "emergency."

Although Collier acknowledged that, in responding to a Priority 2 dispatch, he was required by regulation to proceed without activating warning devices and to obey all statutes governing the operation of motor vehicles, he testified that he nevertheless "decided to take the quickest route possible" because an infant was locked in a vehicle and "we just [did not] know what to expect when we [got] there." Collier stated, "[T]here [was] a potential of injury or loss of life.

Especially with a child in a car." Because of that potential, I believe that responding to a dispatch involving an infant in a locked vehicle is fundamentally different than responding to public service calls in general and that the former, unlike the latter, requires the exercise of discretion and judgment to effectuate the governmental purpose of providing rescue services.

The fourth prong of the James test has been determinative in several of this Court's cases. A review of those cases illustrates that whether the act in question involves the exercise of judgment and discretion generally turns on whether effectuating the governmental purpose embraces "special risks." Colby, 241 Va. at 129, 400 S.E.2d at 187. For example, in Colby, a police officer, with emergency blue lights activated, was pursuing, in a high-speed chase, a motorist who had proceeded through a red traffic light. Id. at 127, 400 S.E.2d at 185. Although the police officer's municipal employer had promulgated guidelines governing responses to emergency situations, we recognized that such guidelines could not "eliminate the requirement that a police officer, engaged in the delicate, dangerous, and potentially deadly job of vehicular pursuit, must make prompt, original, and crucial decisions in a highly stressful situation." Id. at 129, 400 S.E.2d at 187. The police officer, unlike a driver in routine traffic, had to

"make difficult judgments about the best means of effectuating the governmental purpose by embracing special risks in an emergency situation."  Id.

Similarly, in National R.R. Passenger Corp. v. Catlett Volunteer Fire Co., 241 Va. 402, 405, 404 S.E.2d 216, 217 (1991), a volunteer fireman was driving a fire truck, with emergency equipment activated, to the site of a car fire on private property.  The fireman failed to stop before crossing railroad tracks as required by both state law and certain internal safety policies of the volunteer fire company that owned the fire truck.  Id.  As the fire truck proceeded over the railroad tracks, it collided with a train.  Id.  Citing our decision in Colby, we could not "logically distinguish the act of crossing a railroad track without stopping in order to extinguish a fire from running a red light in order to apprehend a traffic offender."  Id. at 413, 404 S.E.2d at 222. Effectuating the governmental purpose in both situations involved "special risks."  See also Smith v. Settle, 254 Va. 348, 352-53, 492 S.E.2d 427, 429-30 (1997) (ambulance driver traveling with siren and red lights activated to a location where he could establish radio contact with his other squad members was entitled to sovereign immunity although he actually had not been dispatched to the scene of an emergency when he was involved in a motor vehicle accident); Hylton, 260 Va. at 64,

14

530 S.E.2d at 424 (police officer exercised discretion and judgment when he decided to pursue a motor vehicle operator who had committed a traffic infraction even though the officer was just attempting to begin that pursuit when he collided with another vehicle).

The importance of "special risks" in our analysis of the fourth prong of the James test is further demonstrated by two cases involving school bus drivers. In Wynn v. Gandy, 170 Va. 590, 591, 197 S.E.2d 527, 527 (1938), the driver of a school bus was proceeding from a filling station where the bus had been serviced to a school for the purpose of picking up children at the school. As the children were crowding around and running after the moving bus, one student was shoved into the bus, causing fatal injuries. Id. We did not afford the school bus driver sovereign immunity because the defense is not available for "the performance of duties which do not involve judgment or discretion in their performance but which are purely ministerial." Id. at 595, 197 S.E.2d at 529. In contrast, we held in Linhart v. Lawson, 261 Va. 30, 36, 540 S.E.2d 875, 878 (2001), that a school bus driver's act of transporting children involved discretion and judgment. The factual difference between Wynn and Linhart was that the driver in Linhart was actually transporting children at the time of the accident at issue. See Stanfield, 245 Va. at 345, 429 S.E.2d at 14 (noting

15

that the school bus driver in Wynn claimed sovereign immunity merely because he was operating a school bus not because he was actually transporting children at the time of the accident). The "special risks" connected with the act of transporting school children in a bus are apparent.

We discussed the concept of "special risks" again in Stanfield. There, a city employee was operating a city truck and spreading salt during a snowstorm when the truck skidded on ice into an intersection and collided with a bus. Id. at 342, 426 S.E.2d at 12. The city driver had completed a special course of instruction for employees who operated snow removal equipment and was required to obtain a chauffeur's license, learn defensive driving techniques, and complete at least 16 hours of on-the-job training. Id. In effectuating the governmental purpose of snow removal, the city employee had to determine whether to apply salt to a particular street and, if so, how much salt to spread, whether to plow the snow away, or whether to do both. Id. We concluded that, at the time of the accident, the city employee was not involved in "the simple operation" of the city truck, id. at 344, 429 S.E.2d at 13 (quoting Heider v. Clemons, 241 Va. 143, 145, 400 S.E.2d 190, 191 (1991)), "nor was he driving 'in routine traffic.' " Id. (quoting Colby, 241 Va. at 129, 400 S.E.2d at 187). "[T]he conduct of driving and spreading salt combined as an integral

16

part of the governmental function of rendering the city streets safe for public travel." Id. Thus, operation of the city truck "involved special risks arising from the governmental activity and the exercise of judgment or discretion about the proper means of effectuating the governmental purpose." Id.

Conversely, we found no "special risks" arising from the operation of an automobile by a deputy sheriff when he collided with a motorcycle as he was leaving a residence where he had just served judicial process. Heider, 241 Va. at 145, 400 S.E.2d at 191. Recognizing that every driver of a vehicle makes "myriad decisions," which in ordinary driving situations are "ministerial obligation[s]," we held that "[t]he defense of sovereign immunity applies only to acts of judgment and discretion which are necessary to the performance of the governmental function itself." Id. There, the deputy sheriff's simple operation of the police vehicle "did not involve special risks arising from the governmental activity, or the exercise of judgment or discretion about the proper means of effectuating the governmental purpose." Id.

Unlike the deputy sheriff in Heider, Collier was not involved in the simple operation of a fire truck nor was he driving in an ordinary situation. As in Colby, Collier's employer had established regulations governing the manner in which he had to operate the pumper truck in responding to

17

different types of dispatches. But, those guidelines did not eliminate the need for Collier to make prompt, crucial decisions about the proper means of effectuating the governmental purpose of delivering the manpower and equipment needed to rescue an infant locked in a vehicle. He had to accomplish that purpose by operating a 40,000-pound pumper truck. Collier explained that he needed to be "extra careful" when driving the vehicle because of its size and the distances required to stop safely. An ordinary person without special training would not be allowed to operate that type of fire truck. Collier had the special training. Collier further explained that, since he did not know the condition of the infant, he "decided to take the quickest route possible." Given these facts, I conclude that the act of operating the pumper truck in conjunction with the act of providing rescue services involved "special risks" and the exercise of judgment and discretion as to the most effective means of accomplishing the governmental purpose. Surely, if "special risks" attended the operation of the salt truck in Stanfield, the same is true here when Collier was responding to a dispatch concerning an infant locked in an automobile.

For these reasons, I respectfully dissent and would affirm the judgment of the circuit court.

18